UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
WANDA SCOTT,

                     :

            Plaintiff,

                     :        15 Civ. 8785 (AJP)

      -against-

                     :        **OPINION & ORDER**

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF THE SOCIAL     :
SECURITY ADMINISTRATION
and COMMISSIONER OF SOCIAL SECURITY, :

          Defendants.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ANDREW J. PECK, United States Magistrate Judge:**

        Plaintiff Wanda Scott, represented by counsel, brings this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying her Supplemental Security Income ("SSI") benefits.  (Dkt. No. 6: Compl.)  Presently before the Court is the Commissioner's motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  (Dkt. No. 23: Comm'r Notice of Mot.) The parties have consented to decision of this case by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Dkt. No. 33.)

        For the reasons set forth below, the Commissioner's motion (Dkt. No. 23) is DENIED, and the case is remanded to the Commissioner for further proceedings.

## FACTS

**Procedural Background**

        On May 29, 2014, Scott protectively filed for SSI, alleging disability since October 1, 2013.  (Dkt. No. 21: Administrative Record ("R.") 57, 110.)  After the Commissioner denied

Scott's application (R. 58-68), she requested a hearing (R. 70-72), which was held before ALJ Gitel Reich on May 12, 2015 (R. 27-43).  On May 28, 2015, ALJ Reich issued a decision finding Scott not disabled and able to perform unskilled sedentary work.  (R. 12-22.)  The Appeals Council denied review on September 10, 2015.  (R. 1-5.)

**Non-Medical Evidence and Testimony**

Scott, born in 1966, was forty-seven years old at the alleged October 1, 2013 onset of her disability.  (R. 110.)  Scott was in special education but completed a GED and one year of college.  (R. 376.)  She lives in a shelter for domestic violence victims.  (R. 32, 109.)  Scott has had only odd jobs since the 1980s, and she last worked in 2013.  (R. 32.)  Scott was convicted of three felonies for which she served approximately fifteen years in prison (R. 378), and most recently was released in August 2012 after a drug trafficking conviction (R. 40-41, 451, 711).  Scott has a history of drug abuse (marijuana, heroin, cocaine, pain killers, opiates) and is currently on a Methadone maintenance program.  (R. 31, 260, 372, 378.)  She reported that while she was unable to do household chores, she was capable of traveling by public transportation.  (R. 142.)  Scott does not spend time with other people (R. 141) and has had issues getting along with authority figures, losing a job as a result (R. 138).

Scott testified that both mental and physical conditions prevented her from working. (R. 34.)  Scott testified that she had bipolar disorder, PTSD, attention deficit disorder, memory loss, obsessive compulsive disorder, depression, "really bad anxiety," "very bad nightmares," seizures and panic attacks.  (R. 34-37, 41, 133, 138, 152.)  While Scott acknowledged that medications helped her "[t]o a certain degree," she stated that the medication had the side effect of causing "twitching in the legs," and she still hated people, hated to be in crowds, and had auditory hallucinations.  (R. 35-37, 41-42.)  Scott stated that because of these conditions, she was unable to

concentrate (R. 152), unable to go out alone (R. 142), did not like people and crowds (R. 133), did not keep up with acquaintances (R. 37) and was locked in an isolated unit in prison for exhibiting behavioral problems (R. 40).  In terms of physical conditions, Scott testified that she suffered from a torn meniscus in both knees, chronic asthma or chronic obstructive pulmonary disease, back pain and acute migraines.  (R. 37-40.)  Scott stated that her physical conditions kept her from lifting objects, sitting for long periods of time and walking or climbing stairs.  (R. 38-39.)

**Relevant Medical Evidence Before ALJ Reich**

### Treating Sources

#### F.E.G.S./WeCare

Scott was assessed by Dr. Robert London of F.E.G.S./WeCare on July 9, 2013.  (R. 193.)  The exam notes show that Scott had "limited sustained concentration and limited attention," some insight, logical thinking form and fair judgment.  (R. 194.)  Scott showed some nonexertional work limitations: emotional ("mood swings, low stress tolerance"), interpersonal ("unstable interpersonal relationships and limited work h[istory]") and general ("limited pace and limited productivity").  (R. 196-97.)  Dr. London diagnosed Scott with bipolar disorder, post-traumatic stress disorder, obsessive-compulsive disorders, antisocial personality disorder, paranoid personality disorder, and epilepsy.  (R. 197-98.)  Dr. London determined that Scott's medical condition would "[l]ast [f]or [a]t [l]east 12 [m]onths" and make Scott unable to work.  (R. 198.)

The F.E.G.S. records include a biopsychosocial summary prepared by F.E.G.S. social worker Vanessa Thompson in January 2007.  (R. 222.)  The summary noted that Scott was diagnosed with and received treatment for paranoid schizophrenia in 2006 and in the years prior to 1995. (R. 227.) The summary also identified that Scott was severely depressed when evaluated, that she had asthma, seizures, anxiety, psychosis; she was diagnosed with post-traumatic seizure

disorder.  (R. 228, 233, 235.)

The F.E.G.S. records also include an evaluation by Robin Kaynor conducted on June 27, 2013.  (R. 238-39.)  Scott traveled independently by public transportation to this appointment. (R. 242.)  Kaynor concluded that Scott suffered no exertional limitations and the only nonexertional limitations noted were emotional ("low stress environment"), respiratory (need to be working "indoors with good ventilation," "[a]void irritants/chemicals") and environmental limitations ("need[] seizure precautions; no unprotected heights; patient should not drive vehicles or operate machinery"; "[a]void extreme temperatures").  (R. 272-74.)  Kaynor diagnosed Scott with asthma and anxiety.  (R. 278-79.)

### Kings County Hospital Center

Believing that she had a psychiatric problem, Scott sought a psychosocial assessment at Kings County Hospital Center on November 20, 2012.  (R. 446.)  Scott reported that she did not care about her family, had no friends, drugs made her feel normal and that her parental rights were terminated.  (R. 448.)  Scott also was an abuse victim: she was molested as a child by her uncle and was physically abused and locked in closets by her mother.  (R. 446, 449.)  She had been hospitalized for psychiatric reasons more than 10 times since she was 15 years old.  (R. 450.)  Scott had a GAF score of 65, and was diagnosed with psychotic disorder NOS, rule out SCAF bipolar type, rule out PTSD, and seizure disorder.  (R. 457.)  In a letter dated March 30, 2015, Nurse Falconer of Kings County Hospital Center confirmed that Scott was diagnosed with PTSD and mood disorder, and was receiving individual and group mental health treatment and medication management at the hospital.  (R. 686.)

Kings County Hospital records reflect that Scott went to the emergency room for injury and pain to her right knee on December 4, 2014 (R. 659), and for asthma on September 23,

2013 (R. 338-39, 348-49, 366).  During an examination on August 28, 2013, Scott was diagnosed with unspecified episodic mood disorder and generalized convulsive epilepsy.  (R. 521-23.)  Scott received a brain MRI on September 23, 2013 because of her diagnosis of "[g]eneralized convulsive epilepsy" (R. 364), which revealed no acute findings (R. 365).  During the September 23, 2013 visit, doctors also examined Scott's left knee (R. 367) and concluded that there were "[s]mall intercondylar notch osteophytes" (R. 368).  A bilateral knee evaluation on December 4, 2014 revealed normal findings.  (R. 665.)  During the visit, Scott "suddenly became irate and began to verbally abuse staff" and others.  (R. 667.)

### Lincoln Medical and Mental Health Center

On May 25, 2013, Scott was transported to Lincoln Medical Center by EMS for "aggressive behavior very[] combative towards people at the shelter." (R. 403-04.)  Scott had a GAF score of 35, and was diagnosed by Dr. Pronoy Roy with epilepsy, substance induced mood disorder, bipolar II disorder, OCD by history and opiates dependence.  (R. 405-06.)  Scott also was diagnosed with "Schizophrenia, Residual, Chronic w/Acute Exacerbation" (R. 383-87), but did not meet the involuntary admission criteria (R. 400).

### SUNY Downstate Medical Center

SUNY Downstate Medical Center's attestation report dated April 14, 2014 and April 15, 2014 noted that Scott was diagnosed with unspecified episodic mood disorder, suicidal ideation, opioid type dependence unspecified use, post-traumatic stress disorder, asthma, epilepsy without intractable epilepsy, cocaine dependence unspecified use, bipolar disorder, borderline personality disorder and schizoaffective disorder.  (R. 530, 532.)  The records also include evaluation reports leading to the above diagnoses.  (R. 550-630.)

### Lutheran Family Health Centers

Scott was evaluated by Dr. Eric Yu at Lutheran Family Health Centers on October 15, 2013.  (R. 458-61.)  Scott reported "a long history of stressors, including physical abuse from her mother, molestation from her uncle, witnessing her father murder her uncle [and] being in solitary confinement while incarcerated."  (R. 458.)  Scott further stated a history of OCD symptoms, mood instability and auditory hallucinations.  (Id.)  Dr. Yu diagnosed Scott with PTSD, obsessive-compulsive disorders, and bipolar disorder.  (R. 460.)

### State of Connecticut Department of Correction

The Connecticut Department of Correction records state that Scott was released on August 31, 2012.  (R. 711.)  The August 31, 2012 release report notes that Scott had "[m]ood [d]isorder NOS, PSD, PTSD," and seizure disorder.  (R. 712.)  When Scott was incarcerated, she spent much of the time in a restrictive housing unit due to behavioral issues.  (Id.)  The release report further notes that Scott "has a history of trauma starting at an early age[,] [h]as a history of mood lability, depression, anxiety, and anger issues [and has] visual and auditory hallucinations."  (Id.)

### Brightpoint Health

Scott visited Brightpoint Health on March 27, 2015 for knee pain "due to bilateral meniscus tears of both knees."  (R. 720.)  Nurse Nancy Partos noted that Scott had "pain/difficulty going up and down stairs which causes her to have unsteady gait and puts her at risk for falls."  (Id.)  Dr. Sydelle Ross evaluated Scott and in a letter dated April 16, 2015, stated that "[o]n physical exam, [Scott had] obvious limitation to her functional status as indicated by increased pain with full extension of the knee."  (R. 719.)  Dr. Ross further stated that Scott's "ability to flex the knee is limited to only 90 degrees on the right and 60 degrees on the left because of increased pain. Normally, someone should be able to flex the knee to 120 degrees."  (Id.)  Dr. Ross therefore

recommended that Scott "avoid activities that involve standing or walking for long periods of time." (Id.)  Scott was referred to an orthopedic surgeon for further treatment for the meniscus tears in both knees.  (R. 726.)

### Consultative Medical Evidence

#### Dr. Dipti Joshi

Dr. Joshi performed a consultative examination of Scott on September 16, 2014.  (R. 371.)  Dr. Joshi described Scott's complaints of migraine headaches, photophobia, phonophobia, nausea, vomiting, seizures, asthma, COPD, PTSD, bipolar disorder, schizoaffective disorder, and knee pain.  (Id.)  Although Scott "[c]annot walk on heels and toes," she required no assistance to "get[] on and off [the] exam table."  (R. 372.)  She "appeared to be in no acute distress."  (Id.)  Dr. Joshi diagnosed Scott with seizures, migraine headaches, a history of substance abuse, bipolar disorder, post-traumatic stress disorder, schizoaffective disorder, asthma, chronic obstructive pulmonary disease, grand mal seizures, and left knee pain.  (R. 374.)  Dr. Joshi stated that Scott "should avoid working from heights, operating heavy machinery, and driving [a] motor vehicle.  She should avoid dust, smoke, fumes, and strenuous activity, as well as chemicals and perfumes."  (Id.)  Dr. Joshi referred Scott for a psychology evaluation.  (Id.)

#### Dr. Arlene Broska

Dr. Arlene Broska performed a consultative psychiatric evaluation of Scott on September 16, 2014.  (R. 376-81.)  Dr. Broska first reviewed Scott's psychiatric and treatment history.  (R. 376.)  Scott received psychiatric treatment while she was imprisoned, and after release she continued to receive treatment from Nurse Falconer once per week and Dr. Chung twice a month at Kings County Hospital Center.  (Id.)  In the current functioning section, Dr. Broska discussed Scott's descriptions of her symptoms.  (R. 376-78.)  Scott described that she "wakes up three times

per night," "d[id] not have a good appetite" and "gets irritated."  (R. 376.)  She stated that she "like[d] animals more than people," experienced frequent mood changes and tried to commit suicide on at least seven occasions.  (R. 377.)  Scott reported that she was abused in the past by her wife who tried to kill her, and her memory of abuse could be triggered by a wide range of factors.  (Id.) She experienced breathing problems, dizziness and sometimes got nauseous and wanted to vomit. (Id.)  When her anxiety gets severe, Scott becomes aggressive.  (Id.)  Scott stated that she washed herself frequently and will "rewash" anything touched.  (Id.)  Scott reported that she was sexually assaulted by a prison guard at the age of 46 and by her former boyfriend when she was 22, and was physically and sexually tortured as a 5-year-old child by her mother and uncle.  (R. 377-78.)  Scott further described that she had "auditory and visual hallucinations" where voices told her to kill herself or to "do 'strange things.'"  (R. 378.)

In her mental status examination, Scott appeared well groomed, spoke clearly and fluently, had clear thought and had a neutral mood.  (R. 379.)  She was oriented times three and had normal memory skills.  (Id.)  She displayed no sign of hallucinations, delusions or paranoia.  (Id.) Scott's insight and judgment, however, were "[p]oor."  (Id.)  Broska diagnosed Scott with unspecified bipolar and related disorder, post traumatic stress disorder, unspecified obsessive-compulsive and related disorder, opiate use disorder, cannabis use disorder and history of PCP use disorder.  (R. 380.)  Dr. Broska concluded that

> Vocationally, there is no evidence of limitation in [Scott's] ability to follow and understand simple directions and instructions, perform simple and complex tasks independently, maintain attention and concentration, and learn new tasks. There is evidence for moderate limitation in maintaining a regular schedule . . . .  There is evidence for marked limitation in making appropriate decisions, relating adequately with others, and appropriately dealing with stress.
>
> The results of the examination appear to be consistent with psychiatric and substance abuse problems and this may significantly interfere with [Scott's] ability to function

on a daily basis.

(R. 380.)  Dr. Broska recommended psychiatric treatment, individual psychological therapy and substance abuse treatment.  (Id.)  Scott's prognosis was "[g]uarded."  (Id.)

### Dr. Irene Chow

Dr. Irene Chow performed a consultative medical examination of Scott on January 8, 2014.  (R. 488-94.)  After reviewing Scott's psychiatric history beginning at age 15 (R. 489-90), Dr. Chow diagnosed Scott with a history of seizure disorder, a history of migraine headaches, asthma, left knee pain, methadone program, and substance use - recent relapse (R. 493).  Dr. Chow concluded that "there are mild to moderate limitations to prolonged walking, stair-climbing and heavy lifting.  [Scott] should avoid driving, operating machinery or working in environments near heavy machinery or heights due to her seizure disorder.  [Scott] should avoid dust, smoke or known respiratory irritants."  (R. 493-94.)  Dr. Chow called for a psychological evaluation.  (R. 494.)

### Reviewer Dr. S. Juringa

On October 6, 2014, reviewer Dr. S. Juriga reviewed the record to determine if Scott was disabled.  (R. 45-56.)  Dr. Juriga found that Scott had asthma, epilepsy, affective disorders and substance abuse disorders.  (R. 50.)  He found that these disorders resulted in a "[m]ild" limitation on maintaining concentration, persistence or pace, but a "[m]oderate" limitation on maintaining social functioning.  (Id.)  Moreover, he found that Scott was moderately limited in performing activities with a schedule, and maintaining regular attendance.  (R. 53.)  He also found moderate limitations on proximity to others without being distracted by them; moderate limitations on interacting with the public, getting along with co-workers, and accepting instructions or criticism from supervisors.  (R. 53-54.)

**ALJ Reich's Decision**

On May 28, 2015, ALJ Reich denied Scott's application for benefits.  (R. 22.)  ALJ Reich applied the five-step analysis in her decision.  (R. 15-16.)  At step one, ALJ Reich found that Scott "ha[d] not engaged in substantial gainful activity since May 29, 2014, the application date." (R. 17.)

At step two, ALJ Reich found that Scott "ha[d] the following severe impairments: bilateral meniscus tears, seizure disorder, asthma, PTSD, bipolar disorder, and a history of substance abuse."  (Id.)

At step three, ALJ Reich determined that Scott "d[id] not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  (Id.)  ALJ Reich found that Scott's mental impairments "d[id] not meet or medically equal the criteria of listing 12.04" because Scott had only moderate difficulties in social functioning and in concentration, persistence or pace, no restriction in activities of daily living, and "experienced no episodes of decompensation when she [wa]s not abusing drugs."  (R. 17-18.)

ALJ Reich found that Scott "ha[d] the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a).  [Scott] is capable of performing simple, routine, and repetitive work that has only occasional contact with people.  She cannot work around heights, dangerous machinery, or drive motor vehicles.  She can have only occasional exposure to respiratory irritants."  (R. 18.)  In reaching this conclusion, ALJ Reich "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p[, and] also considered opinion evidence in accordance with the requirements of 20 CFR 416.927

and SSRs 96-2p, 96-5p, 96-6p and 06-3p."  (R. 19.)

After "consider[ing] all records and reports," ALJ Reich determined that Scott's "own activities and the medical evidence of record does not support the degree of limitations alleged" by Scott.  (R. 21.)  ALJ Reich found that Scott had "some history of bipolar disorder and several other impairments, but her most recent GAF score showed only low moderate depressive symptoms and the results of her consultative psychiatric examination showed only moderate limitations when she is sober" and "she [wa]s able to travel on her own."  (R. 21, record citations omitted.)

ALJ Reich assigned "only some weight to Dr. Joshi's opinion . . . because he did not fully address [Scott's] limitations."  (Id.)  ALJ Reich also assigned only "some weight to Dr. Broska's opinion . . . because it is not consistent with the balance of the record that indicates [Scott] has at most, moderate mental limitations when she is not using drugs."  (Id.)  Moreover, ALJ Reich assigned "some weight to the DDE mental consultant's [Dr. Juriga's] opinion . . . because he/she is not a treating or examining source and his/her, opinion is not consistent with objective medical evidence."  (Id.)  ALJ Reich assigned considerable weight to Dr. Chow's opinion because ALJ Reich found Dr. Chow's "opinion is consistent with the evidence in the record."  (Id.)[1]

At step four, ALJ Reich found that "[t]ransferability of job skills is not an issue because the claimant does not have past relevant work."  (R. 22.)

At step five, ALJ Reich found that "[c]onsidering [Scott's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Scott] can perform."  (Id.)  ALJ Reich determined that:

If the claimant had the residual functional capacity to perform the full range of

---

[1]   ALJ Reich "assign[ed] considerable weight to Dr. Joshi's opinion (Exhibit 17F)".  (R. 21.) Exhibit 17F, however, contains Dr. Chow's opinion, not Dr. Joshi's.  (R. 489.)

sedentary work, considering the claimant's age, education, and work experience, Medical-Vocational Rule 201.18 would direct a finding of "not disabled". However, the additional limitations have little effect on the performance of unskilled sedentary work. A finding of "not disabled" is therefore appropriate under the framework of rules 85-15 and 96-9p.

(R. 22.) Based on this finding, ALJ Reich concluded that Scott has "not been under a disability, as defined in the Social Security Act since May 29, 2014, the date the application was filed." (Id.)

### Additional Medical Evidence Submitted to and Considered by the Appeals Council

After ALJ Reich's decision, Scott was evaluated at Kings County Hospital Center on June 24, 2015 by Nurse Falconer. (R. 734-36.) During this evaluation, Nurse Falconer diagnosed Scott with mood disorder NOS, post-traumatic stress disorder, borderline personality disorder, seizures, asthma, migraines and knee problems. (R. 735.) Scott had a GAF score of 60. (R. 736.)

Scott also was assessed by Dr. Mayumi Benavides at Columbia University on May 12, 2015 and June 2, 2015. (R. 730-33.) Dr. Benavides diagnosed Scott with mood disorder NOS, psychotic disorder NOS, rule out bipolar disorder, rule out schizoaffective disorder, PTSD, rule out OCD, opiate dependence on replacement therapy (methadone), rule out borderline personality disorder, TBI, seizure disorder and asthma. (R. 733.) Scott had a GAF score of 50. (Id.)

## ANALYSIS

## I.   THE APPLICABLE LAW

### A.   Definition of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart

v. <u>Walton</u>, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); <u>Impala</u> v. <u>Astrue</u>, 477 F. App'x 856, 857 (2d Cir. 2012).[2/]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); <u>see</u>, <u>e.g.</u>, <u>Barnhart</u> v. <u>Thomas</u>, 540 U.S. at 23, 124 S. Ct. at 379; <u>Barnhart</u> v. <u>Walton</u>, 535 U.S. at 218, 122 S. Ct. at 1270.[3/]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." <u>Mongeur</u> v. <u>Heckler</u>, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[4/]

---

[2/]    <u>See also</u>, <u>e.g.</u>, <u>Salmini</u> v. <u>Comm'r of Soc. Sec.</u>, 371 F. App'x 109, 111 (2d Cir. 2010); <u>Betances</u> v. <u>Comm'r of Soc. Sec.</u>, 206 F. App'x 25, 26 (2d Cir. 2006); <u>Surgeon</u> v. <u>Comm'r of Soc. Sec.</u>, 190 F. App'x 37, 39 (2d Cir. 2006); <u>Rodriguez</u> v. <u>Barnhart</u>, 163 F. App'x 15, 16 (2d Cir. 2005); <u>Malone</u> v. <u>Barnhart</u>, 132 F. App'x 940, 941 (2d Cir. 2005); <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d 377, 383 (2d Cir. 2004), <u>amended on other grounds</u>, 416 F.3d 101 (2d Cir. 2005); <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002); <u>Draegert</u> v. <u>Barnhart</u>, 311 F.3d 468, 472 (2d Cir. 2002); <u>Shaw</u> v. <u>Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000); <u>Brown</u> v. <u>Apfel</u>, 174 F.3d 59, 62 (2d Cir. 1999); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999); <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999); <u>Balsamo</u> v. <u>Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998); <u>Perez</u> v. <u>Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996).

[3/]    <u>See also</u>, <u>e.g.</u>, <u>Salmini</u> v. <u>Comm'r of Soc. Sec.</u>, 371 F. App'x at 111; <u>Betances</u> v. <u>Comm'r of Soc. Sec.</u>, 206 F. App'x at 26; <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d at 383; <u>Draegert</u> v. <u>Barnhart</u>, 311 F.3d at 472; <u>Shaw</u> v. <u>Chater</u>, 221 F.3d at 131-32; <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 77; <u>Balsamo</u> v. <u>Chater</u>, 142 F.3d at 79.

[4/]    <u>See</u>, <u>e.g.</u>, <u>Brunson</u> v. <u>Callahan</u>, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at
(continued...)

**B.** **Standard of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination. E.g., 42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011).[5/] "Thus, the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision.'" Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[6/]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v.

---

[4/]     (...continued)
*1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62.

[5/]     See also, e.g., Prince v. Astrue, 514 F. App'x 18, 19 (2d Cir. 2013); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

[6/]     See also, e.g., Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

Apfel, 167 F.3d at 773-74.[7/]   "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence."   Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983).  The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'"   Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[8/]

The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'"   E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir. 2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity."  [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination

---

[7/]   See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[8/]   See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted).[9/]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training.  See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[10/]

## II.   ALJ REICH ERRED IN TREATING THE GRID AS DISPOSITIVE GIVEN SCOTT'S NONEXERTIONAL PSYCHOLOGICAL LIMITATIONS

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his

---

[9/]   Accord, e.g., Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774;  see also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

[10/]   See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

age, his education, his experience and his training."  Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).[11/]

> In meeting her burden under the fifth step, the Commissioner:

> may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid".  The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy.  Generally the result listed in the Grid is dispositive on the issue of disability.

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); see, e.g., Heckler v. Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the promulgation of the Grid); Roma v. Astrue, 468 F. App'x at 20-21; Martin v. Astrue, 337 F. App'x 87, 90 (2d Cir. 2009); Rosa v. Callahan, 168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

However, "relying solely on the Grids is inappropriate when nonexertional limitations 'significantly diminish' plaintiff's ability to work so that the Grids do not particularly address plaintiff's limitations."  Vargas v. Astrue, 10 Civ. 6306, 2011 WL 2946371 at *13 (S.D.N.Y. July 20, 2011); see also, e.g., Travers v. Astrue, 10 Civ. 8228, 2011 WL 5314402 at *10 (S.D.N.Y. Nov. 2, 2011) (Peck, M.J.), R. & R. adopted, 2013 WL 1955686 (S.D.N.Y. May 13, 2013); Lomax v. Comm'r of Soc. Sec., No. 09-CV-1451, 2011 WL 2359360 at *3 (E.D.N.Y. June 6, 2011) ("Sole reliance on the grids is inappropriate, however, where a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations.'").

---

[11/]    See, e.g., Roma v. Astrue, 468 F. App'x 16, 20 (2d Cir. 2012); Arruda v. Comm'r of Soc. Sec., 363 F. App'x 93, 95 (2d Cir. 2010); Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

Rather, where the claimant's nonexertional limitations "'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp v. Bowen, 802 F.2d at 605); see also, e.g., Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert."); Rosa v. Callahan, 168 F.3d at 82 ("Where significant nonexertional impairments are present at the fifth step in the disability analysis, however, 'application of the grids is inappropriate.'  Instead, the Commissioner 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'" (quoting & citing Bapp v. Bowen, 802 F.2d at 603, 605-06)); Suarez v. Comm'r of Soc. Sec., No. 09-CV-338, 2010 WL 3322536 at *9 (E.D.N.Y. Aug. 20, 2010) ("If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." (quoting Zabala v. Astrue, 595 F.3d at 411)).

ALJ Reich relied exclusively upon the medical-vocational guidelines to determine that "there are jobs that exist in significant numbers in the national economy that [Scott] can perform."  (R. 22; see page 11 above.)  In doing so, ALJ Reich wrote that Scott's "additional limitations have little effect on the performance of unskilled sedentary work."  (R. 22; see page 11 above.)  ALJ Reich already had determined that Scott's nonexertional limitations limited her to "simple, routine, and repetitive work that has only occasional contact with people.  [Scott] cannot work around heights, dangerous machinery, or drive motor vehicles.  [Scott] can have only occasional exposure to respiratory irritants."  (R. 18; see page 10 above.)  ALJ Reich further noted that Scott "has some psychotic features but they are not disabling" and Scott's "consultative

psychiatric examination showed only <u>moderate limitations</u> when she is sober." (R. 21, emphasis added.) At step five, however, ALJ Reich did not further explain her conclusion that these "additional limitations" had "little effect" on the range of work open to Scott. (<u>See</u> R. 22.)

In relying upon the Grids, rather than the testimony of a vocational expert, ALJ Reich was obligated to explain her finding that Scott's nonexertional limitations had only a negligible impact on the range of work permitted by her exertional limitations. <u>See</u>, <u>e.g.</u>, <u>Chaparro</u> v. <u>Colvin</u>, 15 Civ. 2349, 2016 WL 213430 at *18 (S.D.N.Y. Jan. 19, 2016) (Peck, M.J.) ("In relying upon the Grids, rather than the testimony of a vocational expert, ALJ Edgell was obligated to explain her finding that [the claimant's] nonexertional limitations had only a negligible impact on the range of work permitted by his exertional limitations."); <u>Hernandez</u> v. <u>Colvin</u>, 13 Civ. 3035, 2014 WL 3883415 at *15 (S.D.N.Y. Aug. 7, 2014) ("Although an ALJ has discretion to conclude that the Grid adequately addresses a plaintiff's non-exertional impairments, courts in this Circuit have held that the ALJ is obligated to explain such a finding."); <u>Cruz</u> v. <u>Colvin</u>, 12 Civ. 7346, 2013 WL 3333040 at *19 (S.D.N.Y. July 2, 2013) (Peck, M.J.) (Where the ALJ "treated the Grid as dispositive because he found that [claimant's] nonexertional limitations did not significantly reduce, or only had a negligible impact on, [claimant's] work capacity . . . [the ALJ] was obligated to explain that finding."), <u>R. & R. adopted</u>, 2014 WL 774966 (S.D.N.Y. Feb. 21, 2014).

Moreover, courts in this district consistently have found it to be reversible error for ALJs to rely solely on the Grids when a plaintiff has moderate psychiatric limitations resulting in nonexertional limitations. <u>See</u>, <u>e.g.</u>, <u>Chaparro</u> v. <u>Colvin</u>, 2016 WL 213430 at *18; <u>Kessler</u> v. <u>Colvin</u>, 14 Civ. 8201, 2015 WL 6473011 at *2, *6-7 (S.D.N.Y. Oct. 27, 2015) (remand where ALJ "did not . . . address whether [the plaintiff's] impairments required expert testimony" and did not "identify types of unskilled jobs [the plaintiff] could perform" because the ALJ should have

explained why vocational expert testimony was unnecessary for a plaintiff who could not perform his past relevant work and whose "'sole impairment [was] a mental impairment'"); Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 442 (S.D.N.Y. 2010) ("[P]laintiff's mental health symptoms -- including the noted impact of pain on her psychological status -- potentially constituted non-exertional limitations on her ability to work.  Without an explanation by the ALJ of why her mental health problems did not constitute nonexertional limitations, he was obligated to conduct a non-grid assessment of her work capability under step five.  It was therefore improper for the ALJ to rely solely on the grids as the exclusive determinant of disability status . . . .  In this situation it would be necessary for the ALJ to call a vocational expert, submit other evidence of jobs that an individual with her limitations could perform, or to explain fully why plaintiff's limitations are not significant enough to warrant the opinion of such an expert." (fns. omitted)); Baldwin v. Astrue, 07 Civ. 6958, 2009 WL 4931363 at *28 (S.D.N.Y. Dec. 21, 2009) ("[W]e consider the ALJ's conclusion that the plaintiff's non-exertional limitations did not significantly impact his employment prospects to be erroneous.")

Thus, as Scott argues, because she "needs to be in contact with others, [and to] relate appropriately to others . . . even [for] unskilled work, application of the Medical-Vocation Guidelines is erroneous."  (Dkt. No. 27: Scott Br. at 29.)  Scott's medical records reflect a variety of mental conditions, which are documented through multiple diagnoses and self-reports.  (See page 2-9 above.)  Although the Commissioner argues that "[v]ocational expert evidence was not warranted, as the RFC finding did not include nonexertional limitations that 'significantly diminish' the occupational base of sedentary work" (Dkt. No. 32: Comm'r Reply Br. at 8), ALJ Reich was at a minimum obligated to explain her findings.  Thus, ALJ Reich should not have made a blanket conclusion that Scott's nonexertional limitations would have little impact on the performance of

sedentary work, and should have provided more explanation in this regard.

As for the two Second Circuit decisions cited by the Commissioner (Comm'r Reply Br. at 7), neither Zabala v. Astrue, 595 F.3d at 411, nor Zedanovich v. Astrue, 361 F. App'x 245, 246 (2d Cir. 2010), supports the proposition that an ALJ may determine that a claimant's nonexertional limitations had little or no effect on the occupational base without any further explanation.  In Zedanovich v. Astrue, the Second Circuit upheld the ALJ's determination where he had "'carefully analyzed plaintiff's nonexertional impairments and determined that there was no significant limitation in the range of unskilled sedentary work that plaintiff could perform.'" Zedanovich v. Astrue, 361 F. App'x at 246 (emphasis added).  In Zabala v. Astrue, 595 F.3d at 411, the Second Circuit upheld an ALJ's reliance on the Grids following the ALJ's finding that a claimant's nonexertional limitations "did not result in an additional loss of work capacity" because the "ALJ found that Petitioner's mental condition did not limit her ability to perform unskilled work, including carrying out simple instructions, dealing with work changes, and responding to supervision." Zabala v. Astrue, 595 F.3d at 411.  In contrast, although ALJ Reich determined that Scott "is capable of performing simple routine, and repetitive work that has only occasional contact with people," she also found a history of bipolar disorder and several other psychiatric impairments with moderate depressive symptoms and other moderate limitations.  (See pages 10-11 above.)  ALJ Reich did not discuss how these findings related to her step five determination.  (See pages 11-12 above.)  Nor did ALJ Reich provide any other discussion of what evidence she relied on to determine that Scott's "moderate [mental] limitations" had only a negligible impact on the occupational base of unskilled sedentary work.  (See id.)

Therefore, because ALJ Reich failed to explain why Scott's nonexertional limitations had only a negligible impact on the range of work available, this case is remanded for vocational

22

expert testimony and a more detailed explanation from ALJ Reich why Scott's mental impairments

do not affect her ability to do sedentary work.[12]

## CONCLUSION

For the reasons discussed above, the Commissioner's motion for judgment on the

pleadings (Dkt. No. 23) is <u>DENIED</u>, and the case is remanded to the Commissioner for further

proceedings.  The Clerk of Court shall close the case.


SO ORDERED.


Dated:         New York, New York
               July 18, 2016



                                              _____
                                              **Andrew J. Peck**
                                              United States Magistrate Judge



Copies ECF to:         All Counsel


---

[12]    Scott also argues that ALJ Reich failed to properly weigh the medical opinion evidence
(Scott Br. at 14-19), erred in formulating the residual functional capacity (Scott Br. at 14-19,
25-27), failed to perform a proper evaluation of Scott's history of substance abuse (Scott Br.
at 23-25) and failed to properly evaluate Scott's credibility (Scott Br. at 21-23), and that the
Appeals Council erred when it determined that Scott's new evidence did not warrant review
(Scott Br. at 19-21).  Because ALJ Reich's erroneous reliance on the Grids requires remand,
it is not necessary for the Court to address these arguments. On remand, the SSA should
consider Scott's arguments.